IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IAN MORDLE, | : | |
| Petitioner | : | No. 1:CV-00-1163 |
| | : | |
| v. | : | (Judge Kane) |
| | : | (Magistrate Judge Durkin) |
| IMMIGRATION AND NATURALIZATION SERVICE, | : | FILED HARRISBURG, PA |
| Respondent | : | AUG 17 2000 |

MARY E. D'ANDREA, CLERK

## RESPONSE TO HABEAS CORPUS PETITION

Deputy Clerk

This is a habeas action brought under 28 U.S.C. §2241 by a pro se alien, Ian Mordle, a citizen of Guyana, against the Immigration and Naturalization Service ("INS"). Mordle challenges his continued detention pending deportation. This response is filed on behalf of the INS in opposition to the petition for a writ of habeas corpus.

### Statement of the Case

Mordle is a citizen of Guyana who lawfully entered the United States as an immigrant on December 14, 1980. (Exhibit A (Post Order Custody Review Worksheet) at p. 1.) On May 12, 1994, Mordle was convicted in Kings County, New York, of criminal possession of a controlled substance. (Exhibit A at p. 2.) On March 31, 1995, Mordle was convicted in Kings County, New York, of criminal possession of a weapon and placed on probation for five years. (Exhibit A at p. 2.) On January 13, 1997, Mordle was convicted in Adams County, Pennsylvania, of burglary, criminal trespass and theft, and sentenced to imprisonment for 18 to 36 months. (Exhibit A at p. 2.)

On October 10, 1997, the INS detained Mordle and charged him with being removable for having been convicted of a controlled substance violation under 8 U.S.C. §1227(a)(2)(B)(i), for having been convicted of a firearms offense under 8 U.S.C. §1227(a)(2)(C), and for having been convicted of an aggravated felony under 8 U.S.C. §1227(a)(2)(A)(iii). (Exhibit A at p. 2.) Mordle admitted the allegations, and on April 21, 1998 an Immigration Judge entered an order of removal to Mordle's home country of Guyana. (Exhibit A at p. 1.) Mordle did not appeal and the order of removal became final. (Exhibit A at p. 1.)

On June 29, 1999, at the State Correctional Institution at Camp Hill, where Mordle had served his sentence for the Adams County burglary, trespass and theft charges, he was again turned over to INS custody. (Exhibit A at p. 1.) On July 12, 1999, the INS requested the issuance of travel documents for Mordle from the Consulate of Guyana. (Exhibit A at p. 1; Exhibit B (Declaration of Gregory Kendrick), ¶ 3.) On December 6, 1999, and again on January 24, 2000, INS requested assistance from headquarters in obtaining travel documents. (Exhibit A at p. 1; Exhibit B, ¶ 3.)

The INS then considered Mordle for release on bond pending removal, serving him notice of his scheduled file review on March 13, 2000. (Exhibit A at p. 7.) The file review actually took place on April 3, 2000. (Exhibit A at p. 5.) The Deportation Officer conducting the file review recommended detention, noting the seriousness of Mordle's convictions on three occasions for

2

drugs, firearms and burglary. (Exhibit A at p. 5.) The Deportation Officer further noted that Mordle had committed two disciplinary infractions--making alcohol in his cell and acting as a look-out for a fellow detainee breaking out the window in his cell-- while in custody at the York County Prison awaiting removal. (Exhibit A at p. 5.) The Deportation Officer further noted that Mordle, although given an opportunity to provide information on his own behalf, had declined to do so. (Exhibit A at p. 5.) The reviewing officer concurred with the Deportation Officer's recommendation of detention, and on April 12, 2000 the Assistant District Director made the determination that Mordle should remain in custody until deported or until his next review in six months. (Exhibit A at pp. 5-6.)

Mordle's native country of Guyana does cooperate in repatriating its citizens when they are removed from the United States. (Exhibit B, ¶ 5.) Indeed, in July 2000, the government of Guyana accepted four aliens ordered removed from the United States without issuing travel documents. (Exhibit B, ¶ 6.) Thus, Mordle's detention is not likely to be indefinite.

### Question Presented

> Whether the petition for a writ of habeas corpus should be denied, since the Third Circuit and a judge of this Court have held that the detention of an alien for a prolonged period is permitted by the relevant statutes and is constitutional where the INS provides individualized periodic review of the alien's eligibility for release on bond, and where the petitioner was provided such meaningful review?

3

ARGUMENT

A. <u>The Statutory and Regulatory Provisions Governing Detention Pending Deportation</u>.

Under 8 U.S.C. §1226(c) and §1231(a)(1),(2), the Attorney General[1] must detain criminal aliens during removal proceedings and during the initial 90 days after the entry of a final order of removal. After the 90-day removal period, the Act allows the Attorney General to detain criminal aliens and any alien "who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal." 8 U.S.C. §1231(a)(6). An alien seeking release from custody must demonstrate by clear and convincing evidence that he or she is not a threat to the community and is likely to comply with the removal order when it can be executed. <u>Id</u>.; 8 C.F.R. §241.4 (1998).

Apart from this regulatory process, the INS recently established its own policy guidelines that give long-term detainees automatic review of their custody status after the expiration of the removal period. <u>See</u> <u>Ngo v. Immigration and Naturalization Service</u>, 192 F.3d 390, 400-401 (3rd Cir. 1999)(Appendix). As the Third Circuit held, the statutory regime, the implementing regulations, and the policy guidelines embodied in the Interim Procedures provide long-term detainees a

---

[1] The Act references the authority of the Attorney General, which has been duly delegated to the INS and other branches of the Executive Office for Immigration Review. 8 C.F.R. §§2.1, 100.2(a).

4

continuing and fair opportunity to seek release from custody. See Ngo, 192 F.3d at 398-99.

In Ngo, the Third Circuit recognized that the Supreme Court has repeatedly held that immigration matters are controlled by the Government's political branches and are largely immune from judicial control. Ngo, 192 F.3d at 395-96. While observing that prior Supreme Court precedent upholding lengthy detention of excludable aliens has been "much criticized," id., at 396, and while itself critical of the "fiction" that "detention is not punishment," id. at 397-98, the Third Circuit recognized that Supreme Court precedent precluded the conclusion that aliens have a constitutional right to be free from prolonged detention. Id. at 395-98.

The Circuit then found that aliens with criminal backgrounds could be detained for lengthy periods provided that appropriate provisions for parole were available. Id. at 398. The Circuit further held that the Interim Procedures created by the INS, with its bi-annual reviews, including the opportunity for an annual personal interview, satisfied due process. Id. at 399-401. Accordingly, no alien is subject to permanent or indefinite detention, regardless of whether his country of origin is willing to acquiesce in his repatriation. See Zadvydas v. Underdown, 185

F.3d 279 (5th Cir. 1999); <u>Barrera-Echavarria v. Rison</u>, 44 F.3d 1441, 1450 (9th Cir.)(en banc).[2]

B. **<u>Mordle's Rights Have Not Been Violated Under the Third Circuit's Holding in *Ngo*.</u>**

With this explanation of the statutory and regulatory process in mind, we turn to Mordle's claim that his continued detention pending deportation to Guyana violates his constitutional rights. Preliminarily, we believe the Third Circuit's recent decision in <u>Ngo</u>, 192 F.3rd 390, ought to end this matter. In that Mordle has received the required custody review under <u>Ngo</u>, his constitutional challenge to his detention has no merit.

Although the Third Circuit in <u>Ngo</u> amended its opinion to specify that its holding was confined to "excludable" aliens, offering "no views" on whether the holding would apply to "deportable" aliens, 192 F.3d at 398 n. 7, it is submitted that this distinction is without substance in the context of this case for the following reasons:

---

[2] See also <u>Ho v. Green</u>, 204 F.3d 1045 (10th Cir. 2000); <u>Parra v. Perryman</u>, 172 F.3d 954, 958 (7th Cir. 1999); <u>Guzman v. Tippy</u>, 130 F.3d 64 (2nd Cir. 1997); <u>Gisbert v. U.S. Attorney General</u>, 988 F.2d 1437, 1447 (5th Cir. 1993); <u>Alvarez-Mendez v. Stock</u>, 941 F.2d 956 (9th Cir. 1991); <u>Garcia-Mir v. Meese</u>, 788 F.2d 1446 (11th Cir. 1986); <u>Palma v. Verdeyen</u>, 676 F.2d 100, 103-104 (4th Cir. 1982); <u>In re Mariel Cubans</u>, 822 F.Supp. 192, 195-96 (M.D.Pa. 1993)(continued detention pending deportation does not violate aliens' due process rights).

6

C.  **Ngo Applies Equally to Deportable Aliens**

Aliens not formally admitted into the United States previously were known as "excludable" aliens because they were subject to exclusion proceedings. Lawfully admitted aliens (lawful permanent resident aliens or LPRs) who later were sought to be removed from the United States were known as "deportable" aliens because they were subject to removal through deportation proceedings. The immigration laws have now been changed to refer to exclusion and deportation proceedings as "removal" proceedings, with "excludable" aliens now referred to as "inadmissible" aliens. Ngo, 192 F.3d at 394 n.4; Zadvydas v. Underdown, 185 F.3d 279, 289-97 (5th Cir. 1999).

Generally, "excludable" aliens are those aliens who seek *to enter* the United States but are ineligible to do so. Because entry into the United States is a privilege and not a right, denial of entry is not a deprivation of a right subject to procedural due process. Ngo, 192 F.3d at 395-96; Zadvydas, 185 F.3d at 294-95. Moreover, although the United States may "parole" excludable aliens into the country pending their return to their country of origin, this does not constitute formal "admission" and the alien remains an "excludable" alien (now known as an "inadmissible" alien) with no procedural rights in the removal process. Ngo, 192 F.3d at 392 n.1.[3]

---

[3] This parole concept for excludable aliens developed due to past travel practices when aliens would seek to enter the United

7

In contrast, aliens who seek entry into the United States may be granted leave to do so and may later become lawful permanent residents ("LPRs"). As a result, LPRs develop an interest in remaining in the United States that entitles them to <u>limited</u> procedural due process rights *before* they can be *removed* from this country. Zadvydas, 185 F.3d at 295.

But once a previously admitted alien or lawful permanent resident alien is given those procedural rights in his removal proceedings (previously known as deportation proceedings) and is ordered removed from the United States, that alien is then on the same footing as an alien never formally admitted into the United States. In other words, once ordered removed, either previously via "exclusion" or "deportation" proceedings, or now under "removal" proceedings, no alien has the right to remain in the United States pursuant to the United States' plenary powers to exclude aliens.[4]  Zadvydas, 185 F.3d at 295-97 ("Once the

---

States by sea. In such cases, rather than forcing the boat to stay at sea, the United States would permit the boat to dock, let its passengers off, then continue on its way. Allowing that courtesy did not constitute agreeing to the "admission" of the excludable alien. See Mezei, 345 U.S. at 215. This policy or fiction continues to this day for practical and/or humanitarian reasons.

[4] While both types of aliens have the right to be free from abuses that cannot be justified as being in furtherance of immigration goals, Zadvydas, 185 F.3d at 296, once found to be removable from the United States, neither type of alien has the right to remain at large in the United States. See Wong Wing v. United States, 163 U.S. 228, 234-38 (1896)(while Congress has the constitutional power to exclude aliens from coming into the United States <u>and</u> to deport those who previously entered the country with its assent, it is not constitutional to further compel the alien to

decision is made to deport a resident alien, then, there is little, if any, difference in the government's interest in effectuating deportation of a resident alien and expulsion of an excludable alien").

As of this writing, two judges of this Court have held that the Third Circuit's holding in Ngo applies to "deportable" aliens as well as to "excludable" aliens. See Cuesta-Martinez v. Immigration and Naturalization Service, 97 F.Supp.2d 647 (M.D.Pa. 2000) (per Caldwell, J.), appeal pending, No. 00-1921 (3d Cir.); Nguyen v. Holmes, No. 4:CV-99-2118 (M.D.Pa.) (unpublished opinions filed March 3, 2000 and August 4, 2000, per Muir, J., attached hereto). But see Kay v. Reno, 94 F.Supp.2d 546 (M.D. Pa. 2000) (per Rambo, J.). There is yet another case pending before a judge of this Court raising the issue whether Ngo applies to "deportable" as well as to "excludable" aliens. See Meas v. Holmes, No. 3:CV-99-2085 (M.D. Pa.) (before Conaboy, J., and Durkin, M.J.). While there is thus an intra-district conflict on this issue, it is submitted that the better-reasoned position is represented by the Middle District and various Court of Appeals decisions cited above, to the effect that in the context of post-hearing detention of criminal aliens, there is no distinction between "deportable" aliens and "excludable" aliens.

---

perform hard labor before being deported).

The "private interest here is not liberty in the abstract, but liberty in the United States by someone no longer entitled to remain in this country." Parra v. Perryman, 172 F.3d 954, 958 (7th Cir. 1999). In this case, Mordle ceased to be a lawful permanent resident and lawfully in the United States once his removal order became final. See 8 C.F.R. §§ 1.1(p), 3.39, 241.1 (1998); Zadvydas, supra; Foroughi v. INS, 60 F.3d 570, 575-76 (9th Cir. 1995). Having lost the right to remain in the United States, Mordle effectively was assimilated to the status of an excludable alien, see Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 215 (1953)(former lawful permanent resident was assimilated to the status of an excludable alien), and had no right to remain at liberty in the United States.[5]

Thus, regardless whether an inmate is excludable or deportable, the reasoning underlying Ngo requires that Mordle's due process claim be rejected. Even if it did not, though, prior Supreme Court and numerous circuit decisions have recognized that aliens have extremely limited rights and the United States is permitted to detain them pending removal.

D. **Congress's Plenary Powers Over Immigration Permit Detention**

Congress's near-complete power over immigration transcends the specific grant of authority in Article I, section 8 of the

---

[5] See also Fong Yue Ting, 149 U.S. 698, 707 (1893)("The right of a nation to expel or deport foreigners who have not been naturalized ... is as absolute and unqualified, as the right to prohibit and prevent their entrance into the country.").

10

Constitution, and derives from the "inherent and inalienable right of every sovereign and independent nation" to determine which aliens it will admit or expel. Fong Yue Ting v. United States, 149 U.S. 698, 711 (1893). See also INS v. Aguirre-Aguirre, 119 S.Ct. 1439, 1445 (1999)("we have recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context"); Reno v. Flores, 507 U.S. 292, 305 (1993) ("'For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.'")(quoting Mathews v. Diaz, 426 U.S. 67, 81 (1976)); Landon v. Plasencia, 459 U.S. 21, 34 (1982)("control over matters of immigration is a sovereign prerogative within the control of the executive and the legislature"); Kleindienst v. Mandel, 408 U.S. 753, 766-67 (1972); Harisiades v. Shaughnessy, 342 U.S. 580, 587-88 (1952).

"'The exclusion of aliens is a fundamental act of national sovereignty' that 'stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation.'" Zadvydas, 185 F.3d at 288 (quoting United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537 (1950)). As the Supreme Court has made clear, "the *power to expel or exclude* aliens [is] a fundamental sovereign attribute exercised by the Government's political departments *largely immune* from judicial control." Mezei, 345 U.S. at 210 emphasis added). See also Fiallo v. Bell,

11

430 U.S. 787, 796 (1977) (the narrow scope of judicial review, if any, is a function of a policy choice implicating foreign relations with changing political and economic circumstances); Harisiades, 342 U.S. at 588-89 (observing that policy matters involving aliens are vitally and intricately interwoven with contemporary foreign relations and are largely immune to judicial review); Fong Yue Ting, 149 U.S. at 730 (the right to expel or deport aliens "is as absolute and unqualified as the right to prohibit and prevent their entrance into the country.").

The plenary power doctrine extends to immigration detention, for the power to detain is a necessary element of the power to deport. See Carlson v. Landon, 342 U.S. 524, 538 (1952); Wong Wing, 163 U.S. at 235; Clark v. Smith, 967 F.2d 1329, 1332 (9th Cir. 1992). Because detention is a necessary component of the deportation process, an alien's interest in being at liberty pending deportation is "narrow" and "circumscribed by considerations of the national interest." Doherty v. Thornburgh, 943 F.2d 204, 208, 209 (2nd Cir. 1991).

In accordance with these principles, immigration detention decisions of the Attorney General may be reviewed only to the extent of ascertaining the existence of a legitimate purpose. See Flores, 507 U.S. at 306 (holding that detention rule need only "meet the (unexacting) standard of rationally advancing some legitimate governmental purpose"); Carlson, 342 U.S. at 538, 542-46 (requiring only a "reasonable foundation" for Attorney

12

General's custody decision). An immigration detention statute is constitutional if it is based upon a "facially legitimate and bona fide reason," Fiallo, 430 U.S. at 794-95 (1977); Mandel v. Kleindienst, 408 U.S. 753, 770 (1972), and once found, "courts will neither look behind the exercise of discretion, nor test it by balancing its justification against the constitutional interest asserted by those challenging the statute." Campos v. INS, 961 F.2d 309, 316 (1st Cir. 1992)(citing Fiallo, 430 U.S. at 794-95).[6]

Here, Congress has granted the Attorney General broad discretion to determine whether, and on what terms, an alien may be released pending deportation. Although many aliens view detention as a form of punishment, the *Supreme Court* has repeatedly held that detention, like deportation, is not punishment but, rather, is a necessary incident of enforcing immigration laws.[7] Reno v. American-Arab Anti-Discrimination

---

[6] As noted by the Third Circuit in addressing Congress' ability to treat different groups of aliens differently, such laws trigger only a rational basis test that can rest solely on rational speculation rather than on empirical data. In these cases, the courts' role "is not to judge the wisdom or fairness of Congress's policy choices, but rather their constitutionality." DeSousa v. Reno, 190 F.3d 175, 184-85 (3rd Cir. 1999). This deference is all the more required when viewed in the reality that statutes governing aliens are inextricably entwined with immigration policy, which is a constitutional power delegated to Congress, not the courts. See Doan, slip op. at 7.

[7] While the Third Circuit appears to chide the Supreme Court on this point, stating that it is unrealistic to believe that INS detainees are not being punished, Ngo, 192 F.3d at 398-99, it is the Supreme Court's *majority* opinions that control this Court.

13

Committee, 119 S.Ct. 936, 947 (1999); INS v. Lopez-Mendoza, 468 U.S. 1032, 1038-39 (1984); Wong Wing, 163 U.S. at 235, 237-38 (1896).

Because immigration detention is not punishment, the Supreme Court has employed a rational basis standard in determining whether the detention is constitutional, i.e. the decision to detain an alien must be based on a "reasonable foundation." Carlson, 342 U.S. at 540 n. 33. The Supreme Court applied this standard in Flores, a case involving an INS regulation which mandated detention of deportable, unaccompanied juvenile aliens, concluding that detention for the purpose of protecting and promoting the welfare of the aliens met "the (unexacting) standard of rationally advancing some legitimate governmental purpose." Flores, 507 U.S. 292, 306-309.

There is no question that 8 U.S.C. §1231(a)(6), passes constitutional muster. The detention of criminal aliens serves three primary, legitimate governmental objectives: ensuring the aliens' availability for removal, safeguarding the welfare of the community, and maintaining the sovereignty of the United States. See Plasencia, 459 U.S. at 34 ("The government's interest in efficient administration of the immigration laws at the border ... is weighty.").

It also is important to note that §1231(a)(6) is not a mandatory detention provision but rather a discretionary detention provision. It affords aliens a fair opportunity to

14

seek release by establishing through a series of relevant factors that their release from custody would not endanger public safety or otherwise injure the United States. Thus, §1231(a)(6) is a rational and legitimate means of protecting the public from criminal aliens and preventing them from absconding pending removal.

The post-order detention of criminal aliens also rationally advances the government's interest in controlling immigration policy and relations with foreign nations. These grave foreign policy and separation of powers concerns have led the Supreme Court to eschew judicial intervention in the exclusion context. The Supreme Court stated the matter succinctly in <u>Mezei</u>:

> That exclusion by the United States plus other nations' inhospitality results in present hardship cannot be ignored. But, the times being what they are, Congress may well have felt that other countries ought not shift the onus to us; that an alien in respondent's position is no more ours than theirs. . . . [Mezei's] right to enter the United States depends on the Congressional will, and courts cannot substitute their judgment for the legislative mandate.

345 U.S. at 216.

Additionally, as the Ninth Circuit observed in <u>Barrera-Echavarria</u>, if the courts interfered with the Attorney General's statutory authority regarding the admission and parole of aliens in the United States, it would divest the Executive Branch of its "fundamental and sovereign" power to exclude or expel aliens. 44 F.3d at 1448 (citing <u>Carlson</u>, 342 U.S. at 537). For example, if the courts determined that excludable aliens must be paroled

15

after a certain period of detention, "a foreign leader could ... compel us to grant physical admission via parole to any aliens he wished by the simple expedient of sending them here and then refusing to take them back." 44 F.3d at 1448. That was the situation that arose during the Mariel Boatlift in 1980, when the Cuban government sent a large number of its undesirables to the United States and then refused to accept most of them back. The Ninth Circuit correctly recognized that the determinations regarding parole of excludable aliens were properly left to the Attorney General. Barrera, 44 F.3d 1441.[8]

As with the Mariel Cubans, the repatriation of criminal aliens to any country is as much a sensitive foreign policy concern as it is a domestic one, Barrera, 44 F.3d at 1448, and substantial judicial deference is thus owed to the political branches of government in its efforts to revolve this sensitive political problem. See Aguirre-Aguirre, 119 S.Ct. at 1445 ("judicial deference in the immigration context is especially appropriate where officials 'exercise especially sensitive political functions that implicate questions of foreign

---

[8] Accord Gisbert v. U.S. Attorney General, 988 F.2d 1437, 1447 (5th Cir. 1993)("The United States cannot be forced to violate its national sovereignty in order to parole these aliens within its borders merely because Cuba is dragging its feet in repatriating them."); Jean v. Nelson, 727 F.2d 957, 975 (11th Cir. 1984)(en banc)("[T]his approach would ultimately result in our losing control over our borders. A foreign leader could eventually compel us to grant physical admission via parole to any aliens he wished by the simple expedient of sending them here and then refusing to take them back."), aff'd, 472 U.S. 846 (1985).

16

relations."). Accordingly, it is proper to permit the detention of aliens pending deportation, even if such detention will last for a lengthy period of time.

## CONCLUSION

For the above-stated reasons, respondents request this Court to deny the habeas petition with a certification that any appeal is frivolous, lacking in probable cause, and not taken in good faith.

Respectfully submitted,

DAVID M. BARASCH
United States Attorney

U.S. Attorney's Office
228 Walnut Street
P.O. Box 11754
Harrisburg, PA   17108-1754
717/221-4482

THEODORE B. SMITH, III
Assistant U.S. Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IAN MORDLE,                           :
           Petitioner        :   No. 1:CV-00-1163
                                      :
     v.                              :   (Judge Kane)
                                      :   (Magistrate Judge Durkin)
IMMIGRATION AND NATURALIZATION        :
SERVICE,                              :
           Respondent        :

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That this 17th day of August, 2000, he served a copy of the attached

**RESPONSE TO HABEAS CORPUS PETITION**

by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States Mail at Harrisburg, Pennsylvania.

ADDRESSEE:

    Ian Mordle
    C/O York County Prison
    3400 Concord Road
    York, PA 17402

                                              THEODORE B. SMITH, III
                                              Assistant U.S. Attorney